FILED

MAR 25, 2026

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

KEVIN FIELDS,
   *Plaintiff,*

v.

Civil Action No. __5:26-CV-189-BO__

GROW EARLY LEARNING CORP.,
MYLES PHENIX, individually, and
ANDY PEDERSON, individually,
   *Defendants.*

## COMPLAINT

## JURY TRIAL DEMANDED

## I. INTRODUCTION

1. Plaintiff Kevin Fields brings this action against Defendants Grow Early Learning Corp. ("GEL"), Myles Phenix individually, and Andy Pederson individually for whistleblower retaliation under the False Claims Act, race discrimination and retaliation under 42 U.S.C. § 1981, and violations of the Computer Fraud and Abuse Act and the Stored Communications Act.

2. Fields, a Black male with over twenty years of enterprise IT experience, was hired by GEL as a Technology Solutions Specialist on December 29, 2025. Within his first eighty-one days of employment, Fields identified serious compliance failures at GEL—a 100% federally funded Head Start grantee receiving approximately $79.5 million annually in federal grants—including the use of consumer WhatsApp to collect and store sensitive child and family data from migrant farmworker parents without any archiving, audit, or compliance controls, in violation of Head Start Program Performance Standards.

3. Fields reported these concerns in a fourteen-item IT compliance memo submitted to GEL's Chief Legal Officer on March 14, 2026, and a four-item addendum submitted on March 18, 2026. On March 16, 2026, GEL's Chief Legal Officer responded in writing: "We agree with your observation that many of these concerns can and should be addressed promptly." Four days later, on March 20, 2026, GEL terminated Fields. The termination document itself cites "escalatory accusations in response to routine operational decisions," which is the protected compliance-reporting activity.

4. Separately, on March 10, 2026, Fields's direct supervisor, Defendant Myles Phenix, accessed Fields's confidential personnel records in GEL's ADP human resources information system, used the information to research Fields's home property value on Zillow, and attempted to transmit the results to Defendant Andy Pederson, GEL's Chief Technology Officer, via a misdirected Microsoft Teams message. This unauthorized surveillance occurred on the same day that Pederson denied Fields a promotion.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically 31 U.S.C. § 3730(h), 42 U.S.C. § 1981, 18 U.S.C. § 1030, and 18 U.S.C. § 2701.

6. This Court also has jurisdiction under 28 U.S.C. § 1343 because this action seeks to redress the deprivation of civil rights secured by federal law.

7. Venue is proper in the Eastern District of North Carolina, Raleigh Division, because a substantial part of the events giving rise to the claims occurred in Raleigh, Wake County, North Carolina, where GEL's corporate office is located and where Fields was employed.

## III. PARTIES

8. Plaintiff Kevin Fields is a 47-year-old Black male and a citizen and resident of the State of North Carolina. He resides at 3313 Turner Ridge Drive, New Hill, North Carolina 27562.

9. Defendant Grow Early Learning Corp. ("GEL"), formerly known as The East Coast Migrant Head Start Project, is a Virginia nonprofit corporation registered in North Carolina as a foreign corporation (Virginia SOSID 1010667). GEL maintains its principal office at 2301 Sugar Bush Road, Suite 400, Raleigh, North Carolina 27612. GEL is a 100% federally funded Head Start grantee that receives approximately $79.5 million annually from the United States Department of Health and Human Services. GEL operates forty-seven Head Start centers across ten states, employs approximately 1,000 people, and serves the children of migrant and seasonal farmworkers.

10. Defendant Myles Phenix is an individual who, at all relevant times, was employed by GEL as Technology Solutions Manager (IT Lead) at GEL's Raleigh corporate office. Phenix was Fields's direct supervisor. Phenix may be served at 2301 Sugar Bush Road, Suite 400, Raleigh, North Carolina 27612.

11. Defendant Andy Pederson is an individual who, at all relevant times, was employed by GEL as Chief Technology Officer. Pederson began working as CTO in February 2026. Pederson may be served at 2301 Sugar Bush Road, Suite 400, Raleigh, North Carolina 27612.

## IV. FACTUAL ALLEGATIONS

### A. Fields's Employment and Qualifications

12. Fields has over twenty years of enterprise IT experience, including expertise in Microsoft 365, Entra ID, Microsoft Intune, PowerShell, and Exchange Online. Immediately before joining GEL, Fields served as a Senior Escalation Engineer at Riverbed Technology, earning approximately $110,000 per year.

13. On December 29, 2025, GEL hired Fields as a Technology Solutions Specialist at the Raleigh corporate office at an annual salary of $60,000. Fields was hired by Defendant Phenix.

14. Fields is the sole income earner for a family of four. His wife is a full-time caregiver who does not work outside the home. She supervises their fifteen-year-old son, who has autism spectrum disorder and attends an online school program requiring parental supervision. She also drives their eighteen-year-old daughter to all medical appointments because the daughter cannot drive due to Friedreich's Ataxia, a progressive degenerative neurological condition that requires her to use a wheelchair and necessitates ongoing cardiology, physical therapy, and neurology care.

15. During his employment at GEL, Fields completed a domain migration, built automation tools, and resolved approximately one hundred help desk tickets across multiple states. He received no verbal counseling, written reprimand, performance improvement plan, or any other prior discipline during his entire employment.

**B. GEL's Federal Funding and Compliance Obligations**

16. GEL is a 501(c)(3) nonprofit that operates as a Head Start grantee under a grant from the Administration for Children and Families ("ACF"), a division of the United States Department of Health and Human Services. GEL's total annual revenue is approximately $79.5 million, approximately 98% of which comes from federal grants.

17. As a Head Start grantee, GEL is required to comply with the Head Start Program Performance Standards set forth in 45 C.F.R. Parts 1301–1304. Among other requirements, 45 C.F.R. § 1303.20 requires programs to establish procedures to protect the confidentiality of personally identifiable information in child records. 45 C.F.R. § 1303.24 requires programs to maintain child records and ensure only authorized access. 45 C.F.R. § 1302.101 requires programs to implement management systems—including data management procedures approved by the governing body—to ensure the quality, integrity, and security of data.

18. GEL certifies compliance with these federal standards as a condition of receiving its annual grant funding. GEL's 2024 independent audit by Carr, Riggs & Ingram identified material noncompliance (Finding 2024-001: $1,715,203.19 charged to the wrong grant) and a material weakness (Finding 2024-002: $2,123,417 in an asset restatement). The prior 2020 audit also identified a material weakness.

**C. The March 10, 2026 Incident: Unauthorized Access to Personnel Records and Financial Surveillance**

19. On March 5, 2026, GEL posted externally on ADP a position for Senior Technology Solutions Specialist at a salary range of $60,000–$75,000. The posting was not emailed to internal employees as required by Section I.C of the GEL Employee Handbook.

20. On or about March 6, 2026, Defendant Pederson told Fields about the open Senior Technology Solutions Specialist position and discussed Fields's qualifications for the role. During that conversation, Fields voluntarily disclosed that his monthly rent was $2,600 and his take-home pay was approximately $3,000 per month.

21. On the morning of March 10, 2026, while Pederson was evaluating Fields for the Senior position, Defendant Phenix accessed Fields's confidential personnel records in GEL's cloud-based ADP Human Resources Information System ("HRIS"). Phenix obtained Fields's home address from ADP and used that address to research the estimated value of Fields's home on Zillow, a third-party real estate website. Zillow displayed an estimated property value of approximately $625,000.

22. Phenix then sent a Microsoft Teams message to Fields that contained Fields's home address and property value information. Phenix deleted the message within seconds. When Fields confronted Phenix, Phenix confirmed that the message concerned Fields's house and stated it was intended for Defendant Pederson. Fields then disclosed to Phenix that he had sold his house in Apex, was paying $2,600 per month in rent, and had chosen his current home specifically because it has a first-floor bedroom to accommodate his daughter's wheelchair. Phenix commented that "it's hard to find a house with a first-floor bedroom" and walked to Pederson's office.

23. Phenix thus obtained detailed knowledge of Fields's financial vulnerability—his rent obligation, his reliance on home sale proceeds, and his disabled daughter's need for accessible housing—immediately before walking to Pederson's office with the Zillow property research.

24. Section I.G of the GEL Employee Handbook restricts access to an employee's file to "the employee, his or her supervisor, and other employees identified in Grow Early Learning's

Guidelines for Maintaining Confidentiality of Personnel Records." The GEL Standards of Conduct list "unauthorized obtaining of confidential employee information" as grounds for termination. To the best of our knowledge, Phenix was not disciplined for accessing Fields's records.

25. On the same day, at 2:48 PM, Pederson sent Fields an email denying him consideration for the Senior Technology Solutions Specialist position, citing a six-month eligibility restriction. Pederson did not inform Fields that Section II.B of the Employee Handbook provides that "[e]xceptions may be granted only with the written authorization of the Director of Human Resources."

26. A white male employee, identified here as "Joe," was hired by Phenix in December 2025—the same month as Fields—and remains employed by GEL as of the date of this Complaint.

**D. Fields's Discovery of Compliance Violations: The WhatsApp/ChildPlus Problem**

27. Also on or about March 10, 2026, Fields processed two SolarWinds help desk tickets from GEL staff members. In one ticket, a staff member requested help logging into WhatsApp on a company-issued iPhone. In the other ticket, a staff member reported that she could not use her phone properly because it had previously been assigned to another employee, which prevented her from accessing Microsoft apps.

28. Fields determined that a device wipe was the appropriate technical resolution for the Microsoft apps issue. The staff member informed Fields that her device contained WhatsApp messages from parents with child and family data that had not yet been entered into ChildPlus, the official federal Head Start reporting system.

29. Fields consulted Defendant Phenix, who instructed Fields to have the staff member create a personal Apple ID using her company email address, back up the device to personal iCloud, wipe the device, and restore from iCloud backup. Fields documented these interactions and Phenix's instructions in the SolarWinds ticket system and communicated the instructions to the user, noting "my boss said to do this".

30. Fields subsequently learned that GEL deploys free consumer WhatsApp through Microsoft Intune to all company-issued iPhones across all states where GEL operates. WhatsApp is used exclusively for communicating with parents of enrolled Head Start children. Parents of migrant farmworker children send sensitive information through WhatsApp, including health needs, medications, allergies, family circumstances, developmental concerns, emergency contacts, and potentially immigration-sensitive information. Staff then manually copy and paste information from WhatsApp into ChildPlus. There is no automated integration, no verification process, and no audit mechanism.

31. Consumer WhatsApp has no archiving capability, no data loss prevention controls, no organizational management, and no compliance features. A paid WhatsApp Business version with archiving exists, but GEL chose the free consumer version. When phones are wiped through Intune—which is required for device reassignment—all WhatsApp data is permanently destroyed. Phenix's iCloud backup workaround moves federal child data to uncontrolled personal consumer accounts that GEL cannot access, search, audit, or preserve.

32. These practices violate 45 C.F.R. § 1303.20, which requires programs to establish procedures to protect the confidentiality of personally identifiable information in child records; 45 C.F.R. § 1303.24, which requires programs to maintain child records ensuring only authorized

access; and 45 C.F.R. § 1302.101, which requires board-approved data management procedures to ensure the quality, integrity, and security of data.

**E. Fields's Protected Compliance Reporting**

33. On March 12–13, 2026, Fields sent a formal preservation letter to GEL's Chief People Officer, Christopher Davis, and Chief Legal Officer John Menditto, by email and hand delivery, demanding preservation of electronic records related to potential legal claims. Menditto responded: "I have informed the necessary parties of your request and have instructed them to comply."

34. On March 14, 2026, Fields submitted a fourteen-item IT Compliance Concerns Memo to Menditto. The memo identified violations tied to specific federal regulations, including 45 C.F.R. §§ 1302.47, 1302.101, 1303.20, and 1303.24. The concerns included the WhatsApp/ChildPlus data issue, consumer AI tools on company devices without an acceptable use policy, non-functional security cameras at child care sites, and third-party vendor access to child care facilities without proper background checks. Fields wrote that he submitted the memo "in good faith in my capacity as a Technology Solutions Specialist with the goal of improving organizational compliance and protecting the children and families we serve."

35. On March 14, 2026, Fields simultaneously proposed private mediation and requested that GEL fund the approximately $2,000 cost, as Fields could not afford it.

36. On March 16, 2026, GEL's Chief Legal Officer, John Menditto, responded to the compliance memo in an email at 11:34 AM, copied to Chief People Officer Davis, stating: "We agree with your observation that many of these concerns can and should be addressed promptly." In a second email at 11:39 AM, Menditto stated that GEL was engaging outside counsel regarding Fields's legal claims and would be "responsive to your notice."

9

37. On March 18, 2026, Fields submitted a four-item compliance addendum (Concerns 11–14) to Menditto and Davis. Fields delivered the addendum to outside counsel Andrea C. Harris of Feldesman Tucker Leifer Fidell LLP the following day, March 19, both in person and by email. During a March 18 meeting with Menditto and Davis, Menditto acknowledged that the WhatsApp issue was a "long-term project" and stated that GEL needed to "meet the parents where they are." Menditto also stated, "At this time, no one was challenging my version of events."

38. On March 18, 2026, at 3:46 PM, GEL employee Olivia Ferguson sent a company-wide job posting email listing over twenty open positions. The Senior Technology Solutions Specialist position was not on the list. This was the first such company-wide posting email that Fields had seen during his employment, suggesting that GEL began complying with the internal posting requirement of Employee Handbook Section I.C after Fields's compliance memo.

39. On March 19, 2026, Fields delivered a seven-item document request to outside counsel Harris in person and by email. The request sought, among other things, board meeting minutes, the CTO hiring documentation, GEL's written whistleblower policy, its document retention policy, its equal opportunity hiring policy, the history of six-month eligibility exceptions, and the IT department promotion history. None of these requests has been answered.

40. On March 20, 2026, at 9:28 AM, Fields sent a promotion exception request via GEL email to Davis, copied to Menditto and Harris, citing Employee Handbook Section II.B and listing his accomplishments.

## F. GEL's Retaliatory Actions

41. On March 17, 2026, at 10:45 AM, Defendant Pederson emailed Fields that his Microsoft CoPilot AI license was being removed. Fields escalated to Menditto and Davis, writing in bold red text that "operational friction is starting." Menditto responded: "No one at Grow Early Learning is seeking to 'get back at you.'" Fields pulled CoPilot usage reports showing he had 252 prompts (third highest in the organization), while at least one other user had zero usage. Fields voluntarily removed the license. Fields missed a physical therapy appointment that day due to stress. That evening, he could not sleep due to leg pain and took two prescription muscle relaxers. He emailed Menditto, Davis, and Pederson at 2:54 AM about the pain.

42. On March 20, 2026, at 3:00 PM, Davis met with Fields and terminated his employment. Fields was on Day 81 of his 90-day introductory employment period.

43. The termination document, a "Grow Early Learning Employee Corrective Action Form," states the reason for termination as follows: "Kevin has engaged in communications with leadership that could be perceived as disrespectful, accusatory, and inconsistent with expectations for professionalism, collaborative working relationships, and respectful workplace conduct. Documented communications included escalatory accusations in response to routine operational decisions, belittling language toward leadership." The 'escalatory accusations in response to routine operational decisions'" are the compliance concerns that Fields reported in his March 14 memo and March 18 addendum.

44. The termination document misspells Fields's job title as "Tech Solution Specialist" rather than "Technology Solutions Specialist." The supervisor's signature line is unsigned—neither Phenix nor Pederson signed the form. Only Davis, the sole Black member of GEL's C-suite, signed under "HR Approval" on March 20, 2026. Fields did not sign the form.

Fields received no verbal counseling, written reprimand, probation, or performance improvement plan at any point during his employment.

45. The bottom of the termination form states: "Employees who wish to appeal a termination, involuntary transfer, or demotion may do so through the internal grievance process outlined in the Employee Handbook. A formal grievance must be submitted within 10 business days of this notice being served."

46. On the evening of March 20, 2026, Fields sent a grievance form request by email to Davis, copied to Menditto and Harris.

47. On March 21, 2026, at 8:55 AM, Davis denied the grievance request by email, stating: "Per the Employee Handbook, the formal grievance process applies to employees who have completed their introductory 90-day period of employment." Davis further stated: "To the extent any document references appeal, or grievance language, the Employee Handbook governs eligibility and process." This directly contradicts the language of the appeal printed on the termination form that GEL issued to Fields the previous day.

## G. Evidence Preservation Concerns

48. On the evening of March 19, 2026, Fields observed Phenix carrying a laptop to Pederson's office. A new monitor appeared on Phenix's desk. Fields subsequently observed Phenix using a new MSI Crosshair 16 HX AI laptop, a gaming-class laptop costing approximately $1,800–$2,200 that is not standard-issue corporate equipment. Fields found the laptop box in the recycling bin and photographed it.

49. Fields had previously sent a preservation demand on March 16, 2026, specifically naming Phenix's device and requesting preservation of browser history related to ADP access and Zillow research. The apparent swap of Phenix's laptop—the day after Fields delivered his

document request to outside counsel Harris—raises concerns about whether the device containing evidence of unauthorized ADP access and Zillow research has been preserved.

50. Both Phenix and Pederson are named as individual defendants in this action. Both are also in custody of evidence relevant to Fields's claims. This conflict of interest means that the individuals with the strongest incentive to destroy evidence are the same individuals who control the evidence.

## V. CLAIMS FOR RELIEF

## COUNT I

### Whistleblower Retaliation Under the False Claims Act

### 31 U.S.C. § 3730(h)

### (Against Defendant GEL)

51. Fields re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

52. GEL receives approximately $79.5 million annually in federal grant funds from the Department of Health and Human Services. As a condition of receiving these funds, GEL certifies compliance with the Head Start Program Performance Standards, including 45 C.F.R. §§ 1302.101, 1303.20, and 1303.24.

53. GEL's use of consumer WhatsApp to collect and store child and family data without archiving, audit controls, or board-approved data management procedures violates 45 C.F.R. §§ 1302.101, 1303.20, and 1303.24. GEL's continued certification of compliance with these standards while knowingly operating in violation constitutes a false or fraudulent claim for

payment of federal funds, or, alternatively, a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729(a)(1)(A)–(B). See Universal Health Services, Inc. v. Escobar, 579 U.S. 176 (2016) (recognizing implied false certification theory under the FCA).

54. Fields engaged in protected activity within the meaning of 31 U.S.C. § 3730(h) by reporting compliance violations in his March 14, 2026, memo and March 18, 2026, addendum to GEL's Chief Legal Officer. Fields's reports put GEL on notice that its practices could result in false claims for federal payments. GEL's Chief Legal Officer acknowledged on March 16, 2026, that "many of these concerns can and should be addressed promptly."

55. GEL terminated Fields on March 20, 2026—four days after its Chief Legal Officer acknowledged the merit of Fields's compliance concerns and six days after Fields submitted his compliance memo. The termination document expressly cites "escalatory accusations in response to routine operational decisions," which describes Fields's compliance-reporting activity.

56. GEL's termination of Fields was because of Fields's lawful acts in furtherance of efforts to stop violations of 31 U.S.C. § 3729.

57. As a direct and proximate result of GEL's retaliation, Fields has suffered lost wages and benefits, emotional distress, and other damages.

58. Under 31 U.S.C. § 3730(h), Fields is entitled to all relief necessary to make him whole, including reinstatement with the same seniority status, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

## COUNT II

## Race Discrimination

## 42 U.S.C. § 1981

## (Against All Defendants)

59. Fields re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

60. Fields is a Black male. He was hired by Defendant Phenix in December 2025. A white male, "Joe," was also hired by Phenix in December 2025 and remains employed by GEL.

61. On March 10, 2026, Defendant Phenix—Fields's direct supervisor accessed Fields's confidential ADP personnel records without authorization and researched Fields's home property value on Zillow. Phenix attempted to transmit this information to Defendant Pederson via Microsoft Teams. When confronted, Phenix confirmed the message was about Fields's house.

62. On March 10, 2026, Defendant Pederson denied Fields a promotion to Senior Technology Solutions Specialist, citing a six-month eligibility rule but failing to disclose the exception process available under the Employee Handbook. Alicia, a previously held Senior Technology Solutions Specialist, was a Black female who left GEL in late January or early February 2026. Before leaving, Alicia told both Fields and Joe that they could not apply for her role.

63. Fields was terminated on March 20, 2026. The termination form was signed solely by Christopher Davis, the only Black member of GEL's C-suite. The supervisor signature line—where either Phenix or Pederson would have signed—is blank.

64. Race was a but-for cause of GEL's decision to terminate Fields and of the adverse employment actions taken by Phenix and Pederson. See Comcast Corp. v. National Association of African American-Owned Media, 589 U.S. 327 (2020).

65. Defendants' conduct impaired Fields's right to make and enforce contracts, including his employment contract with GEL, on the same basis as white citizens, in violation of 42 U.S.C. § 1981. Section 1981 provides for individual liability against supervisors who participate in discriminatory conduct. See CBOCS West, Inc. v. Humphries, 553 U.S. 442, 445 (2008).

66. As a direct and proximate result of Defendants' race discrimination, Fields has suffered lost wages and benefits, emotional distress, humiliation, and other damages.

## COUNT III

### Retaliation

### 42 U.S.C. § 1981

### (Against All Defendants)

67. Fields re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

68. Section 1981 encompasses claims of retaliation. CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008).

69. Fields engaged in protected activity by, among other things: (a) filing a preservation demand on March 12–13, 2026, putting GEL on notice of potential discrimination claims arising from the March 10 incident; (b) submitting a compliance memo on March 14, 2026, that included a report of unauthorized access to his confidential employee records; (c) submitting a compliance addendum on March 18–19, 2026; (d) requesting a promotion exception on March

20, 2026, challenging the application of the six-month rule; and (e) raising concerns about the racially disparate treatment he experienced.

70. Following Fields's protected activity, Defendants took materially adverse actions against Fields, including: (a) removing Fields's CoPilot AI license on March 17, 2026; (b) denying Fields's remote work request; and (c) terminating Fields on March 20, 2026. See Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) (materially adverse action is one that would dissuade a reasonable worker from making or supporting a charge of discrimination).

71. The temporal proximity between Fields's protected activity and the adverse employment actions, combined with the termination document's express reference to Fields's compliance-reporting activity as the reason for termination, establishes a causal connection between the protected activity and the retaliation.

72. Defendants' retaliation was a but-for cause of the adverse employment actions taken against Fields.

73. As a direct and proximate result of Defendants' retaliation, Fields has suffered lost wages and benefits, emotional distress, and other damages.

## COUNT IV

## Computer Fraud and Abuse Act

## 18 U.S.C. § 1030

## (Against All Defendants)

74. Fields re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

75. GEL's ADP HRIS is a protected computer within the meaning of 18 U.S.C. § 1030(e)(2), as it is a cloud-based system used in and affecting interstate commerce and communication.

76. On March 10, 2026, Defendant Phenix intentionally accessed Fields's confidential personnel records in the ADP system and obtained information—including Fields's home address—that Phenix then used to research Fields's property value on Zillow, a commercial third-party website, and attempted to disclose to Defendant Pederson. Even if Phenix had some level of authorized access to the ADP system for legitimate IT purposes, his access of Fields's records for the purpose of financial surveillance and disclosure to Pederson and a commercial third party exceeded his authorization. See Van Buren v. United States, 593 U.S. 374 (2021). Alternatively, the disclosure of information obtained from the ADP system to Zillow (a commercial third party) and to Pederson (an unauthorized recipient for this purpose) constitutes conduct actionable under § 1030 independent of the access question.

77. Defendant Pederson is liable as the intended recipient of the improperly obtained information and as the individual who, upon information and belief, directed or encouraged the surveillance.

78. GEL is liable for the acts of its employees Phenix and Pederson undertaken in the course and scope of their employment and by virtue of GEL's failure to enforce its own policies regarding confidential employee information.

79. Fields suffered damage and loss as a result of the violation, including invasion of his privacy, emotional distress, and the use of his confidential employment information to his detriment in connection with his employment.

## COUNT V

## Stored Communications Act

## 18 U.S.C. § 2701

## (Against All Defendants)

80. Fields re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

81. ADP's HRIS is an electronic communication service and/or remote computing service within the meaning of 18 U.S.C. § 2711(1)–(2), as it provides cloud-based storage and processing of personnel records transmitted in electronic form.

82. Fields's personnel records stored in the ADP system—including his home address, salary information, and other personal data—are electronic communications or records held in electronic storage within the meaning of 18 U.S.C. § 2701.

83. On March 10, 2026, Defendant Phenix intentionally accessed Fields's stored personnel records in the ADP system without authorization or in excess of authorization. Phenix obtained, altered, or prevented authorized access to Fields's stored communications for a purpose not authorized by the provider of the service or by Fields.

84. Defendant Pederson is liable as the intended recipient of Fields's stored communications and as the individual who, upon information and belief, directed or solicited the unauthorized access.

85. GEL is liable for the acts of its employees, and by virtue of its failure to prevent or remedy the unauthorized access.

86. Under 18 U.S.C. § 2707, Fields is entitled to actual damages, punitive damages, and reasonable attorneys' fees and other litigation costs reasonably incurred.

19

# VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kevin Fields respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

a. Compensatory damages for lost wages, lost benefits, emotional distress, humiliation, and other injuries in an amount to be determined at trial;

b. Punitive damages against all Defendants for their willful, malicious, and reckless conduct;

c. Double back pay with interest under 31 U.S.C. § 3730(h);

d. Reinstatement to his former position or, alternatively, front pay in lieu of reinstatement;

e. Equitable relief, including but not limited to an order requiring Defendants to preserve all evidence, engage an independent forensic examiner, and cease all retaliatory conduct;

f. Reasonable attorneys' fees and costs of litigation pursuant to 31 U.S.C. § 3730(h) and 18 U.S.C. § 2707;

g. Pre-judgment and post-judgment interest as allowed by law; and

h. Such other and further relief as this Court deems just and proper.

# VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2026, I caused the foregoing Complaint and all attachments thereto to be filed with the Clerk of Court. Upon the Court's grant of Plaintiff's Application to Proceed In Forma Pauperis (AO-239) and issuance of summonses, a true and correct copy will be served on all Defendants via the United States Marshal Service pursuant to 28 U.S.C. § 1915(d) and Federal Rule of Civil Procedure 4(c)(3).

Respectfully submitted,

Kevin Fields

_____

Kevin Fields, Pro Se

3313 Turner Ridge Drive

New Hill, North Carolina 27562

Telephone: (515) 556-8955

Email: fieldsk@gmail.com

Dated: _25th, of march_____, 2026